UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MARK JOHNSON,                          )
                                       )
                    Plaintiff,         )
                                       )
          vs.                          )          Cause No. 3:17-CV-825-PPS
                                       )
SOUTH BEND COMMUNITY                   )
SCHOOL COPORATION,                     )
                                       )
                    Defendant.         )

## OPINION AND ORDER

Nothing engenders parental angst quite like high school sports. This case proves the point. It involves an overzealous parent and a high school basketball coach repeatedly knocking heads over player treatment. The coach, Mark Johnson, claims that matters got so bad that he was forced to resign from the South Bend Community School Corporation (SBCSC) and that the whole kerfuffle was about the fact that he is white. His complaint alleges three counts: race discrimination, racial harassment, and retaliation. He says that black employees and parents interfered with and criticized his coaching because of his race and the school failed to respond to his reports of racial harassment. He also argues that this harassment forced him to retire, meaning he was constructively discharged. The matter is now before me on summary judgment. His discrimination claim fails for a number of reasons including a lack of evidence that he suffered an adverse employment action; his harassment claim is a nonstarter because he fails to present evidence of a severe or pervasive work environment; and his retaliation

claim fails because there is a lack of a causal connection between the actions of SBCSC and Johnson's complaint of harassment.  I will therefore grant SBCSC's Motion for Summary Judgment [DE 71].

## Motion to Strike

Before I begin, I will briefly address Johnson's Motion to strike several newspaper articles based on hearsay in SBCSC's motion for summary judgment. [DE 75.] SBCSC argues that the articles statements attributed to Johnson in the articles are admissible as opposing party statements or, alternatively, admissible under the residual exemption to the hearsay rule. [DE 76.] Because I am not relying on any of those statements in the disposition of this motion, I will deny the Motion to Strike as moot.

## Background

Johnson, who is white, taught physical education and coached basketball at SBCSC schools for over thirty years, fifteen of those years at South Bend Riley High School. [DE 18 at ¶¶ 14-15.] His teaching and coaching positions were separate and distinct from one another. [DE 73-6 at ¶9.] Prior to the 2016-2017 Riley boys' basketball season, Principal Francois Bayingana, who is black, received an anonymous letter complaining about Johnson's coaching style saying that "he was not running a good program and he was not helping the kids." [DE 73-7 at 14.] Some parents also complained to Principal Bayingana that Johnson had "double standards and favoritism when it comes to certain players," and provided an example of two tardy players where one was disciplined and the other was not. [DE 73-7 at 16.] Other parents "complained

that [Johnson] always puts the players down during practice and always makes smart comments" and Johnson personally referred to two players as "cancers" in front of Principal Bayingana. [DE 73-3 at 19-20, 73-7 at 17, 36-37.] Some parents transferred their children to other schools because of Johnson's treatment. [DE 73-3 at 18-19, 73-7 at 19-20.]

Johnson didn't take the criticism well. He first complained to Principal Bayingana during their meeting on an unrelated teaching issue in May of 2016. Johnson expressed frustrations of being "a victim of some Riley parents and he is sick and tired of them." [DE 73-7 at 10, 16.] For example, Johnson told Principal Bayingana that Derrick Sr. and Leslie Wesley, who are black and the parents of one prospective player, were "badmouthing him" on Facebook. [DE 73-7 at 13-14.]

It is clear to me that Johnson and the Wesleys did not see eye to eye. For example, Mr. Wesley publicly criticized Johnson's defensive scheme after a loss, and Johnson called Mr. Wesley that evening to express his frustration. [DE 73-1 at ¶ 12.] Despite this, the Wesleys made donations and volunteered as "team parents" during the 2015-2016 basketball season. [DE 73-1 ¶ 11.] Leslie Wesley coordinated and helped pay for pre-game meals. *Id.* at ¶ 13. She also arranged and paid for a banner to honor the seniors that year. *Id.* at ¶ 14. During the 2015-2016 banquet, Johnson gave a speech that one wouldn't expect to hear at a year-end awards banquet; he told the parents and players that they were welcome to transfer to another school if they did not like his

program. *Id.* at ¶ 18. That didn't sit well with Leslie Wesley, and she responded by texting Johnson stating, "Your speech offended me, you hurt the kids . . ." *Id.* at ¶ 19.

On November 7, 2016, Principal Bayingana and Johnson had a conversation about increasing the roster size for the boys' basketball team during the 2016-2017 season. [DE 73-6 at 2, 74-12 at 2.] It was unusual for a principal to get involved in a team's roster size especially since no other teams were directed to increase roster size. [DE 73-7 at 64-65.] Even more unusual was the fact that Principal Bayingana also specifically directed Johnson to keep the Wesley's son (Derrick Wesley, Jr.) on the basketball team. [DE 73-6 at 2, 74-12 at 2.] That evening, Johnson requested Principal Bayingana put these instructions in writing. [DE 74-15.] The next afternoon, Principal Bayingana appeared to backtrack on the command to keep Wesley on the team when he wrote Johnson an email stating, "I believe you and your coaching staff will make the best judgment to choose your teams . . . I will continue to support you no matter what decision you make" after the team was selected. *Id.* But, by then, the team (with Wesley Jr. on it) had already been selected. This prompted Johnson to forward Bayingana's email to his union representative expressing frustration that the email arrived after the team had been selected. [DE 74-16; 73-2 at 16.]

Leslie Wesley was elected to the SBCSC school board on November 7, 2016. [DE 74-12 at ¶¶ 12-13.] A short while later, Johnson held a meeting for the parents of basketball players; he told the parents that this was his "last year." [DE 73-6 at 8.]  But then, after meeting with Principal Bayingana, Johnson had second thoughts. [DE 74-12

¶ 21.] He decided to not retire, under the promise that "he would have control over the decision-making of the basketball team." [DE 74 at 4, 74-12 ¶ 21.] Meanwhile, his relationship with Leslie Wesley continued to deteriorate. On November 28, 2016, Johnson sent an email to one of Riley's assistant principals about Mrs. Wesley contacting another parent and arranging pre-game meals. [DE 74-18.] According to Johnson, Mrs. Wesley was "butting in where she is not wanted or welcomed," usurping his power, and bullying him. *Id.*

At some point in November 2016, Johnson contacted Cheryl Greene Benedict, SBCSC's Executive Director of Legal Services and Human Resources, about Principal Bayingana directing him to keep a player on the team and about Leslie Wesley. [DE 74-17.] Benedict contacted outside counsel but was not aware of or involved in any further investigation. [DE 74-17 at 22-23.] This is the only indication in the record where Johnson filed a formal complaint with SBCSC's human resources department.

The dust up between Johnson and Leslie Wesley continued into December. On December 20, 2016, Johnson sent an email to Principal Bayingana complaining that Mrs. Wesley usurped his authority in setting up senior photos without his permission. [DE 74-21.] Mrs. Wesley requested a meeting with Johnson and included eight additional people on the email. [DE 74-22, 74-24.] Johnson considered her email to be "another form of bullying and harassment." *Id.* The email itself is polite and does not include any language which could be considered harassment, intimidation, or bullying. [DE 74-22.]

In January, Johnson and Leslie Wesley continued their war of words. On January 15, 2017, Johnson emailed Principal Bayingana and eight additional people to complain about Mrs. Wesley's actions: they include Mrs. Wesley setting up team meals without his approval, setting up a photo shoot for senior players without his knowledge, and requesting to hang the senior photos in the gym. [DE 74-25.] Johnson once again threatened to resign as basketball coach at the end of the season unless he was "in total control of the programs and these requests will never be placed on us again." [DE 74-24.] On January 17, 2017, Riley's athletic director chimed in on Johnson's behalf; he emailed multiple individuals, including Johnson, stating that, "At some point, Mark has to be allowed to run his program.  This could be a very special year and team, but won't be if we don't stop the distractions." [DE 74-27.]

By February, others started getting involved in the dispute between Johnson and Leslie Wesley. Charan Richards is the guidance director at Riley and happens to also be Mrs. Wesley's sister. On February 11, Ms. Richards sent an email to Johnson, Principal Bayingana, and two others after "Senior Night." [DE 74-28.] In the email, Ms. Richards criticized Johnson for not congratulating the senior students and not individually introducing them as was done in prior years. *Id.* Ms. Richards' overwrought email states, "[a]s an educator, I am witnessing students greatly affected by the negative behaviors and lack of consistency from the coaching staff. . . Students are humiliated, demeaned and their confidence torn down by comments made to them by you, Mark." *Id.* Ms. Richards also expressed concern about top students transferring to other schools

because of "the way [Johnson] spoke to them, demeaned them and made them feel worthless." *Id.* In response, Johnson stated, "I find it extremely disappointing that so many of the decisions I make are scrutinized," and "there is enough blame to go around for all." [DE 74-29.]

All of this back and forth led to an email written by Ms. Richards that is central to this case. It is one that Johnson points to multiple times in his briefs, and it is the only reference to race directed towards Johnson that I can find in the record. Here is what it says:

> Mark, from LaSalle to Riley you have done African American males (team players) wrong. I heard it in the community and didn't want to believe it. I personally witness[ed] it for myself last year . . . [when] you humiliated that young man . . . you talk to them demeaningly,  you tear down their spirit, you act like they are less than human. You are mean. . . I'm on to you Mark and I'm praying for you.

[DE 74-29.]

Johnson responded by complaining to Principal Bayingana that Ms. Richards's two emails were "a continuing sign of harassment and blatant hostility. I am asking to meet with my building administrators to put an end to this character assassination." [DE 74-30.] On March 4, 2017, Johnson told his union that he was going to expose the "intimidation, harassment and character assassination" by a board member in an interview. [DE 73-6 at 10.] The basketball season ended on March 1, 2017 and Johnson officially retired that month. [DE 72 at 12, 74-12 at ¶ 33.] He was replaced by a white male. [DE 72 at 13.]

Multiple media outlets interviewed Johnson about his retirement, including the South Bend Tribune. SBCSC found out about a Tribune article dated May 11, 2017, which indicated that Johnson had leaked unredacted SBCSC emails to the media. [DE 73-6 at 3.]  Johnson admits that he leaked these emails to the Tribune. [DE 73-2 at 109.] SBCSC reprimanded him for leaking emails in violation of SBCSC's policy and, as a consequence, disallowed him from teaching summer school. [DE 73-6 at 3.] Regardless, SBCSC still paid Johnson the summer school teaching salary and included this income when calculating his pension benefit. [DE 73-6 at 11.] Johnson alleges in his amended complaint that after the Tribune article was published, Leslie Wesley posted on the Tribune's Facebook page "publicly accusing [Johnson] of hidden racism." [DE 18 at ¶ 27.]  Wesley states the "hidden racism" comment was directed only towards the Tribune, not Johnson. [DE 73-9 at 61-64.]

## Discussion

Summary judgment must be granted when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. *Hackett v. City of South Bend*, 956 F.3d 504, 507 (7th Cir. 2020) (internal citation and quotations omitted).  The non-moving party may not rely merely on allegations or denials in its own pleading, but rather must "present the court with the evidence [he] contends will prove [his] case." *Goodman v. NSA, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010).   He may present evidence in the form of affidavits, depositions,

8

answers to interrogatories, and admissions to show a genuine issue for trial. *Celotex v. Catrett*, 477 U.S. 317, 324 (1986).  "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009).

## I.        Race Discrimination Claim

Title VII prohibits employers from discriminating against employees on the basis of race. 42 U.S.C. § 2000e-2(a)(1); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-66 (1986). The inquiry in any employment discrimination case is straight-forward: could a reasonable juror find based on this record that Johnson would have kept his job if he was not white and everything else had been the same? *See Ortiz v. Werner Enterprises, Inc.* 834 F.3d 760 (7th Cir. 2016). In considering this question at summary judgment, all evidence (both direct and circumstantial) must be taken into consideration by the court. *Id*. at 766.

One way of answering this question is by directly concluding, based on all of the evidence, that a reasonable jury could answer the pivotal question in the affirmative. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). But in this case, Johnson simply does not have evidence that raises a colorable fact question. In other words, Johnson fails to present evidence that SBCSC discriminated against him because he was white or that SBCSC had a record of discriminating against white employees. Instead, Johnson spends much of the briefing describing how he *felt* during the 2016-2017 basketball season due to comments by Mrs. Wesley, who became a school board member during the season, and Ms. Richards, the guidance director. He found their comments to be

9

insensitive, unwarranted, and painted him as a racist. Johnson only cites to two references to race in his amended complaint: Ms. Richards' email and Mrs. Wesley's comment on the Tribune's Facebook post regarding "hidden racism." [DE 18, 73-2 at 112-115.] Neither of these have anything to do with Johnson's race. At most, the evidence shows concerns about Johnson's abrasive coaching style – none of which had to do with *his* race, but instead were concerns about the way Johnson treated black athletes.

Importantly, these actions didn't alter the terms and conditions of his employment. *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017). Perhaps they made him feel picked on or uncomfortable, but as best I can tell there was no tangible job action ever taken against Johnson. None of the evidence in the record amount to anything more than criticism of Johnson's treatment of players as a coach. Treatment for perceived actions cannot equate to discrimination on the basis of race. *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) ("a plaintiff's subjective beliefs are insufficient to create a genuine issue of material fact under the direct method").

Johnson also points to directives by Principal Bayingana and actions by Leslie Wesley which he believes usurped and undermined his power as the coach. [DE 74.] But how is a directing a coach to keep a particular player or to increase his team's roster size evidence of racial discrimination? It may be characterized as inappropriate meddling on the part of Principal Bayingana, but it simply has nothing to do with Johnson's race. Weirdly, the other things that Johnson points to as allegedly

discriminatory actions by Mrs. Wesley were actions one would think he would welcome (as he did in previous years.) Mrs. Wesley offered to coordinate and help fund team meals, arrange team photos, and create a banner for the seniors. Perhaps, viewing the evidence in the light most favorable to Johnson, these could be viewed as actions of a nosey parent. But it is entirely lost on me how these actions could reasonably be described as having *anything* to do with impermissible discrimination or Johnson's race.

A second way for Johnson to avoid summary judgment in a disparate treatment case is to rely on the familiar *McDonnell Douglas* burden shifting paradigm. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnel-Douglas*, Johnson can avoid summary judgment by showing that "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employees outside of his protected class received better treatment from his employer." *Igaski v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 957 (7th Cir. 2021). Once he establishes a prima facie case, "the burden shifts to [SBCSC] to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802; *Coleman*, 667 F.3d at 845. Once it does so, then Johnson must present evidence that the stated reason is pretextual. *McDonnell Douglas*, 411 U.S. at 804. In other words, he would have to show that SBCSC's actions were a bogus cover story masking the real reasons for the adverse action. In evaluating the various factors under *McDonnell-Douglas*, I must take into consideration all of the evidence in the record, both direct and circumstantial. *Ortiz,* 834 F.3d at 766.

When someone who is white brings a race discrimination case, there is a nuance that must also be considered. Are they even covered by Title VII?  The answer is almost always yes. Anymore, virtually everyone is afforded protection under Title VII. Even white males can't be discriminated based on their race, but their burden is somewhat different. In reverse discrimination cases, the Seventh Circuit created what can only be described as a fuzzy standard. A white male is a member of a protected class if he can "show background circumstances sufficient to demonstrate that the particular employer has reason or inclination to discriminate invidiously against whites [or men] or evidence that there is something fishy about the facts at hand." *Hague v. Thompson Distribution Co.,* 436 F.3d 816, 820 (7th Cir. 2006) (internal quotations and citations omitted). If so, then the plaintiff is protected by the statute and thus meets the first prong of the *McDonnell Douglas* framework. *Id*. at 821.

I'm dubious that there is something "fishy" going on that would suggest that SBCSC has a reason or inclination to discriminate against white people. To put it bluntly, there is no evidence that SBCSC engaged in behavior or made comments that suggested a discriminatory attitude against whites generally or against Johnson because he is white. Johnson's theory rests on an email and some actions from a board member, two emails from coworker, and one directive from his principal, all based on his coaching style and nothing to do with his race. And indeed, he was replaced by a white male. Nonetheless, because Johnson's case fails at other steps along the way, I will assume without deciding that Johnson is a member of a protected class.

12

In addition to being part of a protected class, Johnson must show that he was meeting his employer's expectations, subjected to an adverse employment action, and treated differently than similarly situated employees, not in his protected class. *McDonnell Douglas*, 411 U.S. at 802.  Johnson provides records that he was meeting his employer's expectations but cannot establish that he was subjected to an adverse employment action or treated differently from similarly situated employees not in his protected class.

An adverse employment action exists when an employer takes an action, based on an employee's protected class, that results in a significant change in an employment condition, such as termination, failure to promote, etc. *See Boss*, 816 F.3d at 917. This means there must be evidence of "a significant change in employment status." *Id.* (internal quotes and citations omitted).  In *Boss*, the Seventh Circuit gave some examples of what could amount to an adverse employment action: "Such changes can involve the employee's current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Id.* (citing *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007)).

There is simply no evidence in the record that Johnson suffered from an adverse employment action. Recall that Johnson voluntarily announced his retirement in March 2017. He now claims that he was constructively discharged, meaning he felt like he had to quit because of the hostile work environment. A constructive discharge can amount

13

to an adverse employment action, but the standard is a high one to meet. The Seventh Circuit recognizes two types of constructive discharge: either (1) "a plaintiff resigns due to discriminatory working conditions even more egregious than that required for a hostile work environment claim" or (2) "an employer acts in a manner that would make clear to a reasonable employee that [he] will be immediately fired if he does not resign." *Fields v. Bd. of Educ.*, 928 F.3d 622, 625 (7th Cir. 2019) (internal citations omitted). Additionally, when claiming constructive discharge as an adverse employment action, the conditions are higher than hostile work environment claims because "an employee is expected to remain employed while seeking redress." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007). As discussed in the next section, Johnson has not shown discriminatory working conditions that amount to a hostile work environment, let alone meet the higher standard of "egregious" for constructive discharge.

The only evidence in the record regarding race are Ms. Richards's email criticizing Johnson's treatment of black athletes and Mrs. Wesley's "hidden racism" comment on the Tribune's Facebook page. [DE  73-2 at 112-115, 73-9 at 64.] Neither of these comments altered Johnson's working conditions and Johnson's perception that he was being painted as a racist does not rise to the level of an egregious working environment. Ms. Richards's email does not discriminate against her coworker, Johnson, based on *his* race but expresses concerns about the way Johnson treated black athletes. Her criticism is not objectively offensive or severe. Ms. Richards's two emails over the course of two days over an entire school year certainly does not prove that the

14

working conditions were so intolerable that Johnson had no choice but to resign. In other words, Johnson's limited evidence cannot "plausibly describe a workplace that was permeated with offensive and demeaning conduct over a significant period of time." *Monroe v. Columbia Coll. Chi.*, 2021 U.S. App. LEXIS 8153, at *12 (7th Cir. 2021).

Secondly, Johnson does not provide any evidence that SBCSC's actions would lead a reasonable employee to believe that unless he resigns, he will be fired. In fact, Principal Bayingana repeatedly encouraged Johnson to reconsider retiring and to continue coaching basketball. [DE 73-7 at 48-51.] No reasonable school employee would believe they were in danger of immediate termination if their principal tried to talk the employee out of retirement and encouraged them to continue teaching and coaching.

Johnson also argues that there was an adverse employment action when he was not allowed to teach summer school during the summer after he resigned.  This seems like an odd request for someone who resigned.  But anyway, while SBCSC did not allow him to teach, SBCSC nonetheless paid Johnson the income he would have earned had he taught summer school and adjusted Johnson's pension accordingly. SBCSC's actions prevented any change in Johnson's income, let alone a significant change. Finally, even if the inability to teach summer school somehow amounted to an adverse employment action, SBCSC provided evidence that Johnson violated the school's policy in leaking internal emails to the Tribune.  Johnson admits this and therefore cannot state that SBCSC's reason is pretextual.

Johnson also fails to offer any evidence under the final prong of the *McDonnell Douglas* prima facie case: there is no evidence that SBSCS treated similarly situated non-white employees differently.

In sum, after reviewing the voluminous record, Johnson has not presented evidence sufficient to demonstrate that SBCSC took any of the actions it did because Johnson is white. The record is completely devoid of any facts that would allow a reasonable jury to infer SBCSC's actions were motivated by any invidious discrimination against whites. The problem with Johnson's case lies in the fact that he was not subjected to an adverse action and he fails to point other non-white similarly situated employees who were treated better than him. No matter how you look at it, there is simply no evidence from which a reasonable jury could determine that SBCSC acted in a discriminatory manner.  Therefore, I grant summary judgment in favor of SBCSC on this claim.

## II.     Racial Harassment Claim

Discrimination can also come in the form of unlawful racial harassment. *See Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 673 (7th Cir. 1993) ("This court repeatedly has recognized that racial harassment is an independent basis for a Title VII claim.").  Johnson claims that SBCSC created a hostile work environment through actions taken by Principal Bayingana, Leslie Wesley (prior to and during her position as a board member), and Charan Richards (a coworker).

In claiming a hostile work environment due to racial harassment, Johnson must show: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (internal quotations omitted). I look to a variety of factors to determine whether Johnson's work environment is hostile within the meaning of Title VII, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *AMTRAK v. Morgan*, 536 U.S. 101, 117 (2002) (citing 42 U.S.C. § 2000e-5(e)(1)).

Here, the evidence is simply too scant to support a hostile work environment claim based on race.  Johnson does not allege that he was "the target of any racial slurs, epithets, or other overtly race-related behavior." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004).  Instead, he points to two emails by Ms. Richards describing Johnson's treatment of black athletes, Mrs. Wesley's alleged interference with the basketball program, and a directive by Principal Bayingana to keep a player on the basketball team and increase the size of the team roster as a pattern of racial harassment against him by SBCSC. At most, the evidence shows concerns about Johnson's abrasive

coaching style – none of which had to do with *his* race, but instead were concerns about the way Johnson treated black athletes. Johnson fails to allege the racial character of this harassment. "None of these incidents are sufficiently connected to race so as to satisfy the second element of the hostile environment analysis." *Id.* Instead, he complains about a lack of control over the decision-making of the basketball team. Principal Bayingana's directives are in no way race-related but related to coaching the basketball team. Johnson believed that Ms. Richards and Mrs. Wesley were conspiring against him to make him out to be a racist. He was disgusted with Mrs. Wesley's "bullying" and "interference" with the basketball program which was, prior to that season, looked upon as beneficial: she set up team meals, photo shoots, and wanted to hang senior photos in the gym.

None of this evidence strikes me as plausibly describing "a workplace that was permeated with offensive and demeaning conduct over a significant period of time." *Monroe*, 2021 U.S. App. LEXIS 8153, at *12. In other words, the offending conduct cannot fairly be described as either severe or pervasive. A few references from Mrs. Wesley and Ms. Richards about Johnson allegedly treating black players more harshly can hardly be called *severe* race-based harassment, nor is it pervasive. *Luckie*, 389 F.3d at 714; *see also Cameli v. O'Neal*, 1997 U.S. Dist. LEXIS 9034, at *44-45 (N.D. Ill. 1997) (finding that the types of comments made, the limited frequency, and the circumstances expressing that the school needed a black coach instead of a white coach did not rise to the level of hostile work environment). The Supreme Court made this plain several decades ago:

18

the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not affect the conditions of employment to sufficiently significant degree to violate Title VII." *Meritor Sav. Bank*, 477 U.S. at 67 (internal quotation and citation omitted); *see also Reed v. Ewald Auto. Group, Inc.*, 420 F. App'x 613, 618 (7th Cir. 2011) ("A handful of episodes of yelling and stray racist remarks cannot sustain a claim of racial harassment or create an inference that race was the reason for Reed's termination."); *Davidson v. State Collection Serv.*, 824 F. App'x 424, 427 (7th Cir. 2020) ("[N]o reasonable jury could find that [a] handful of offensive comments during Davidson's two years of employment rose to the level of severe or pervasive harassment that altered her work environment.").

Johnson's vague and conclusory allegations that he was "bullied," "usurped," and "painted as a racist" simply do not establish that the conduct he was subjected to was severe or pervasive. *Alexander*, 739 F.3d at 982. Therefore, I find that a reasonable jury could not find that the work environment described by Johnson was hostile and grant summary judgment in favor of SBCSC on this claim.

## III.  Retaliation Claim

Johnson also claims SBCSC retaliated against him for complaining about reverse race discrimination. An employer may not discriminate against an employee who has "opposed any practice" made unlawful by Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a).

In alleging retaliation, Johnson may proceed under the direct or indirect method. *Silverman v. Bd. of Educ. Of City of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011).  The direct method requires evidence of "(1) statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007) *aff'd CBOCS West Inc. v. Humphries*, 553 U.S. 442 (2008); *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The indirect method requires Johnson to "show that after opposing [SBCSC's] discriminatory practice only he, and not any similarly situated employee who did not complain of discrimination, was subjected to a materially adverse action even though he was performing his job in a satisfactory manner." *Humphries*, 474 F.3d at 404. But once again, no matter the approach, I need to consider all the evidence, both direct and circumstantial. *Malin v. Hospira, Inc.*, 762 F.3d 552, 559 (7th Cir. 2014).

Johnson's retaliation claim is based on SBCSC disallowing him from teaching summer school after he retired. [DE 74 at 24.] Looking first at the indirect method of proof, Johnson has presented no evidence that others who complained of discrimination were treated better than him. And under the direct method of proof, there is another problem with Johnson's evidence. Presuming for the moment that not being allowed to teach summer school after one retires (but nonetheless being paid for it) is somehow a materially adverse action, the real question is whether there is a causal connection between SBCSC's decision and Johnson's complaints of discrimination. SBCSC has produced evidence of a legitimate, non-retaliatory reasons for not allowing Johnson to

20

teach summer school: Johnson's leak of confidential information to the South Bend Tribune. In a meeting on May 17, 2017, Johnson admitted to SBSCS's superintendent that he furnished unredacted copies of school emails to the Tribune, and that this violated SBCSC's policy. [DE 73-6 at 3.] Based on that action, the Board decided to not allow Johnson to teach summer school (although it paid him anyway). *Id.* In other words, the adverse action (refusing to allow Johnson to teach summer school) had nothing to do with Johnson's complaints of harassment; they had to do with his violation of SBCSC policy.  Johnson has failed to adduce any evidence showing the contrary.

In sum, after considering the parties' arguments and the evidence in the record, I find that Johnson lacks the evidence to show that his complaints of racial harassment caused SBCSC to not retain Johnson to teach summer school. Summary judgment will therefore be granted on this claim as well.

### Conclusion

For these reasons, Defendant South Bend Community School Corporation's Motion for Summary Judgment [DE 71] is **GRANTED** and the Motion to Strike [DE 75] is **DENIED AS MOOT**.  All claims are **DISMISSED WITH PREJUDICE** against SBCSC.  The Clerk is **ORDERED** to close this case.

**SO ORDERED on May 6, 2021.**

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT

21